# IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
### COLUMBIA DIVISION

| | | |
|---|---|---|
| **JOSEPH A. COLWELL, SR. #552372,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | **NO. 1:21-cv-00010** |
| **v.** | ) | |
| | ) | **JUDGE CAMPBELL** |
| **VINCENT VANTELL, Warden,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## MEMORANDUM

Joseph A. Colwell, Sr., a pro se state prisoner, filed a petition for the writ of habeas corpus under 28 U.S.C. § 2254 (Doc. No. 1) and Respondent filed an Answer. (Doc. No. 25). Petitioner then filed a Motion seeking permission to amend the Petition to provide a "more accurate and precise statement" regarding one of his claims. (Doc. No. 28 at 6). Respondent filed a Response to the Motion (Doc. No. 30), and Petitioner filed a Reply. (Doc. No. 35). For the following reasons, Petitioner is not entitled to relief under Section 2254 and this action will be **DISMISSED**.

## I. PROCEDURAL BACKGROUND

A Maury County jury convicted Petitioner of two counts each of rape and incest, and the court sentenced him to an effective twenty-year sentence. (Doc. No. 24-1 at 49–52). The Tennessee Court of Criminal Appeals (TCCA) affirmed, and the Tennessee Supreme Court denied Petitioner's application for permission to appeal. *State v. Colwell*, No. M2016-00130-CCA-R3-CD, 2016 WL 5416337 (Tenn. Crim. App. Sept. 28, 2016), *perm. app. denied* Jan. 19, 2017.

Petitioner filed a pro se petition for post-conviction relief. (Doc. No. 24-14 at 14–28). The court appointed counsel (*id.* at 31), and counsel filed an amended petition. (*Id.* at 36–50). The court held an evidentiary hearing (Doc. No. 24-17) and denied post-conviction relief. (Doc. No. 24-14

at 54–71). The TCCA affirmed, and the Tennessee Supreme Court denied discretionary review.

*Colwell v. State*, No. M2019-00212-CCA-R3-PC, 2020 WL 3886031 (Tenn. Crim. App. July 10, 2020); (Doc. No. 24-23).

## II. FACTUAL BACKGROUND

As context for Petitioner's claims, the Court sets forth the TCCA's summary of the evidence established at trial:

Defendant's son and daughter accused him of rape. At the time of Defendant's arrest and indictment, D.C., the female victim, had just turned fifteen and J.C., the male victim, was thirteen. The children lived in Columbia with their father, who worked as a tow truck driver.

Detective Carl Shrake of the Columbia Police Department responded to a report regarding a rape. When he arrived at the mobile home, he met D.C. and J.C., Defendant's children. Their grandmother was also present at the time. According to D.C., Defendant raped her the night prior to Detective Shrake's visit and had done so on multiple occasions in the past. Detective Shrake noted that the child was visibly upset. J.C. confirmed that Defendant "made him do things" he did not want to do. Detective Shrake sent the children to Nashville to undergo rape evaluations.

At trial, D.C. was almost sixteen years of age. She testified that after enduring ongoing abuse, she finally told a family friend, Shelley Ladd, that Defendant "was raping [her] . . . and her brother." The victim explained that she was "forced" to have sex with her father multiple times even though she "would cry and tell [Defendant] not to [do it]." Defendant would tell D.C. to go into his bedroom. Once in the room, Defendant "would start taking off his clothes." He told D.C. to take off her clothes. When she did not comply, Defendant would take off her clothes. D.C. "always asked him why he did it to me . . . and he would tell me it was because we either scared his girlfriends away or we acted up . . . ." D.C. was "very afraid because it hurt." On the night before she reported the abuse, Defendant put a pillow "underneath her butt" before putting his penis in her vagina. She explained that Defendant "didn't use [a condom]" because "he got fixed so he wouldn't get anybody pregnant." The victim described that, at times, Defendant had her lie on her back and other times she was on her knees. She described Defendant as "rough," and he "would like make noises" or say, "That booty's mine," during the rapes. Defendant often ejaculated on the victim's stomach and "would be like touching her everywhere" when he finished. Defendant told the victim to go clean up and the victim would "use a piece of toilet paper to wipe it off my stomach or anywhere he got it and then I would take a shower."

D.C. was aware that her brother was also being raped. She discussed the abuse with her brother "a lot." D.C. threatened to tell someone about the abuse on more than one occasion, but she explained that she and J.C. were afraid to tell anyone because Defendant would "threaten [them], scare [them]." The victim described being "scared to death" because Defendant had "choke[d her] or jam[med] his finger in [her] or he would talk about how [the victims] would never get to see each other again [because they would end up in foster care]."

J.C., who was fourteen at the time of trial, recalled that two days prior to telling someone about the abuse, Defendant raped him in the living room of their home. J.C. was watching television on the love seat when Defendant came into the room holding "torn-off pieces" of toilet paper in his hand. Defendant said, "Come on, son." J.C. knew what Defendant wanted because Defendant had done this before. J.C. was "afraid." Defendant made J.C. pull down Defendant's pants and boxers. J.C. was on his knees and Defendant made him "suck his thing" with his mouth. Defendant was lying on the couch with his hands on the back of J.C.'s head "pushing [his] head up and down." J.C. testified that he was "angry" at Defendant for "making [him] do it." When Defendant "finished," he "put his sperm in the toilet paper." J.C. never told his father that he did not want to do it because he "didn't want to hurt his feelings."

D.C. admitted that she and her brother had friends over to the house without their father's permission several times during the summer before they reported the abuse. On at least one of these occasions, the basement door was kicked in and someone caused damage to the door of her bedroom. There were also a few "holes" in the walls. D.C. acknowledged that Defendant put in a webcam to monitor activity in the house while he was at work. According to D.C., "someone" unplugged the webcam. J.C. testified that he and D.C. unplugged the webcam.

On the day they actually reported the abuse, D.C. and J.C. invited friends over to the house without their father's permission. Defendant's sister, Tammy Colwell, came to the house to check on things, presumably after Defendant realized that the webcam was unplugged. Tammy made D.C. and J.C. go to their grandmother's house and threatened to call the police on the visitors. D.C. testified at trial that getting caught with friends at the house had nothing to do with her disclosure of the rapes. Shelley Ladd, the person to whom the rapes were first disclosed, testified at trial that she was talking to D.C. on the day the children were caught with friends at the house. D.C. was upset about getting in trouble and was afraid that her father would beat her. Ms. Ladd explained that D.C. "broke down" and proceeded to tell her about the rapes. Ms. Ladd then spoke with J.C. before finding a police officer.

Detective Shrake spoke with Defendant about the allegations, describing Defendant's attitude as "blasé." Defendant denied the allegations and informed Detective Shrake that items were missing from his home because his children had other teenagers over to the house while he was at work. Defendant admitted that he had a vasectomy.

3

Based on the statements from D.C. and J.C., Detective Shrake obtained a search warrant for the residence. Officers removed computers, bed sheets, and couch cushion covers. Additionally, officers obtained the clothing worn by the children. The Tennessee Bureau of Investigation ("TBI") received the items. The search did not result in the discovery of any pornographic material of children on the computers. Additionally, there was no semen found on the victims' clothing.

Defendant did not testify at trial. Briana Colwell, the victims' cousin, testified that D.C. had previously accused Defendant of rape. Ms. Colwell claimed that she visited D.C. one time when she had friends over without permission and that D.C. told her if she got caught she would "lie on her dad" by saying that he raped her.

*Colwell*, 2016 WL 5416337, at *1–2 (footnote omitted).

## III. CLAIMS

The Petition asserts several claims (*see* Doc. No. 1), and Petitioner's pending Motion seeks permission to amend the Petition to ensure that the Court considers one of his claims as he intended. (*See* Doc. No. 28). However, it is unnecessary to amend the Petition because, when liberally construing the Petition, the claim addressed in the Motion is already raised in the Petition. Therefore, for administrative purposes, the pending Motion (Doc. No. 28) will be **DENIED** as moot. But as a practical matter, the Court will consider the claim addressed in the pending Motion alongside the other claims raised in the Petition.

For clarity, the Court has re-numbered Petitioner's claims as follows:

1. The State knowingly withheld exculpatory evidence. (Doc. No. 1 at 29).

2. There is insufficient evidence to support Petitioner's convictions. (*Id.* at 6–15).

3. The trial court imposed an excessive sentence. (*Id.* at 16–20).

4. Pretrial counsel was ineffective for failing to ensure that the victims were sequestered during the preliminary hearing. (*Id.* at 32).

5. Trial counsel was ineffective for failing to:

    A. Request to sever the offenses for trial (*id.* at 18);

4

B.  Request electronic devices seized from Petitioner's residence and retain an expert to properly investigate them (*id.* at 28–31);

C.  File a pretrial motion regarding D.C's sexual activity (*id.* at 26–28);

D.  Research CPIT (Child Protective Investigation Team) protocol (*id.* at 32);

E.  Consult a medical expert to challenge D.C.'s testimony based on a lack of supporting physical evidence (*id.* at 26; Doc. No. 28);

F.  Object to testimony that Petitioner raped the victims on more than one occasion (Doc. No. 1 at 21–25, 31);

G.  Object to D.C.'s testimony that she was not worried about getting in trouble (*id.* at 24, 32);[1]

H.  Object to J.C. leaving the witness stand (*id.* at 32);

I.  Request that the State elect offenses at the end of trial (*id.* at 21, 23);

J.  Assist Petitioner such that his cumulative errors prejudiced Petitioner. (*Id.* at 24).

## IV. LEGAL STANDARD

Federal habeas relief for state prisoners is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). *Harrington v. Richter*, 562 U.S. 86, 97 (2011). AEDPA establishes a demanding standard for granting federal relief on claims "adjudicated on the merits" in state court. 28 U.S.C. § 2254(d). Under AEDPA, such a claim cannot be the basis for federal relief unless the state court's decision was: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

---

[1]    The Court will consider Petitioner's general assertion of failure to challenge "testimony of state witnesses" (Doc. No. 1 at 24) through his more specific assertion that counsel failed to challenge this aspect of D.C.'s testimony. (*See id.* at 32).

Under Section 2254(d)(1), a state court's decision is "contrary to" clearly established federal law "'if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases' or 'if the state court confronts a set of facts that are materially indistinguishable from a decision [of the Supreme Court] and nevertheless arrives at a [different result].'" *Hill v. Curtin*, 792 F.3d 670, 676 (6th Cir. 2015) (en banc) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003)). "Under the 'unreasonable application' clause of [Section] 2254(d)(1), habeas relief is available if 'the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case.'" *Id.* (quoting *Harris v. Haeberlin*, 526 F.3d 903, 909 (6th Cir. 2008)). A state court's application is not unreasonable under this standard simply because a federal court finds it "incorrect or erroneous"—instead, the federal court must find that the state court's application was "objectively unreasonable." *Id.* (quoting *Wiggins v. Smith*, 539 U.S. 510, 520–21 (2003)).

To grant relief under Section 2254(d)(2), a federal court must find that "the state court's factual determination was 'objectively unreasonable' in light of the evidence presented in the state court proceedings." *Young v. Hofbauer*, 52 F. App'x 234, 236 (6th Cir. 2002). State court factual determinations are only unreasonable "if it is shown that the state court's presumptively correct factual findings are rebutted by 'clear and convincing evidence' and do not have support in the record." *Pouncy v. Palmer*, 846 F.3d 144, 158 (6th Cir. 2017) (quoting *Matthews v. Ishee*, 486 F.3d 883, 889 (6th Cir. 2007)). "[I]t is not enough for the petitioner to show some unreasonable determination of fact; rather, the petitioner must show that the resulting state court decision was 'based on' that unreasonable determination." *Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011) (citing *Byrd v. Workman*, 645 F.3d 1159, 1172 (10th Cir. 2011)).

Review of claims rejected on the merits in state court, however, is ordinarily only available to petitioners who "exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). In Tennessee, a petitioner is "deemed to have exhausted all available state remedies for [a] claim" when it is presented to the TCCA. *Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003) (quoting Tenn. Sup. Ct. R. 39). "To be properly exhausted, each claim must have been 'fairly presented' to the state courts," meaning that the petitioner presented "the same claim under the same theory . . . to the state courts." *Wagner v. Smith*, 581 F.3d 410, 414, 417 (6th Cir. 2009) (citations omitted).

The procedural default doctrine is "an important 'corollary' to the exhaustion requirement," under which "a federal court may not review federal claims that . . . the state court denied based on an adequate and independent state procedural rule." *Davila v. Davis*, 137 S. Ct. 2058, 2064 (2017) (citations omitted). A claim also may be "technically exhausted, yet procedurally defaulted" where "a petitioner fails to present a claim in state court, but that remedy is no longer available to him." *Atkins v. Holloway*, 792 F.3d 654, 657 (6th Cir. 2015) (citing *Jones v. Bagley*, 696 F.3d 475, 483–84 (6th Cir. 2012)).

To obtain review of a procedurally defaulted claim, a petitioner must "establish 'cause' and 'prejudice,' or a 'manifest miscarriage of justice.'" *Middlebrooks v. Carpenter*, 843 F.3d 1127, 1134 (6th Cir. 2016) (citing *Sutton v. Carpenter*, 745 F.3d 787, 790–91 (6th Cir. 2014)). Cause may be established by "show[ing] that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Davila*, 137 S. Ct. at 2065 (citations omitted). Prejudice requires a showing that the errors at trial worked to a petitioner's "actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Garcia-Dorantes v. Warren*, 801 F.3d 584, 598 (6th Cir. 2015) (quoting *Hollis v. Davis*, 941 F.2d 1471,

7

1480 (11th Cir. 1991)) (internal quotation marks omitted). And the manifest-miscarriage-of-justice exception applies "where a constitutional violation has 'probably resulted' in the conviction of one who is 'actually innocent' of the substantive offense." *Dretke v. Haley*, 541 U.S. 386, 392 (2004) (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)).

## V. ANALYSIS

Respondent contends that Petitioner's claims are subject to dismissal as not cognizable, without merit under AEDPA's demanding standard of review for claims adjudicated on the merits in state court, or procedurally defaulted. (*See* Doc. Nos. 25, 30). The Court agrees and will address each category of claims in turn.

## A. Non-Cognizable Claims

### 1. Claim 3—Excessive Sentence

Petitioner asserts that his twenty-year sentence is excessive. Specifically, he argues that the trial court erred in applying enhancing and mitigating factors under state law, and that the court's rationale for consecutive sentencing was improper. (Doc. No. 1 at 16–20). Petitioner made these same arguments on direct appeal, and the TCCA considered this claim solely under state law before concluding that Petitioner was not entitled to relief. *Colwell*, 2016 WL 5416337, at *4–5. "[F]ederal habeas corpus relief does not lie for errors of state law." *Thomas v. Stephenson*, 898 F.3d 693, 700 (6th Cir. 2018) (quoting *Estelle v. McGuire*, 502 U.S. 62, 67 (1991), and collecting cases). Therefore, Petitioner's claim that "the trial court's sentencing decision violated state law . . . is not cognizable on federal habeas review." *Noonan v. Burton*, No. 17-2458, 2018 WL 6584905, at *3 (6th Cir. Oct. 15, 2018) (quoting *Estelle*, 502 U.S. at 67).

To the extent Petitioner asserts that the trial court violated his federal right to due process by imposing a sentence "on the basis of misinformation of constitutional magnitude," Petitioner's

sentencing claim is cognizable. *See Noonan*, 2018 WL 6584905, at *3 (internal citations and quotation marks omitted). But at the sentencing hearing, the trial court considered the victims' trial testimony, victim impact statements, and statements to law enforcement reflected in the pre-sentence report, and it accepted the victims' allegations as true. (*See* Doc. No. 24-5 at 29, 32–33, 36–37). Petitioner "has failed to present any evidence, much less clear and convincing evidence, to rebut the presumption of correctness afforded to the trial court's factual findings." *See Noonan*, 2018 WL 6584905, at *3 (citing 28 U.S.C. § 2254(e)) (rejecting habeas petitioner's claim that "the trial court based its upward departure on unproven allegations from his oldest stepdaughter"). Additionally, to the extent Petitioner asserts that his sentence violates the Eighth Amendment, the Sixth Circuit has held that a sentence "within the maximum penalty authorized by statute . . . generally does not constitute 'cruel and unusual' or excessive punishment." *Barrett v. Parris*, No. 20-5202, 2020 WL 4875315, at *4 (6th Cir. July 20, 2020) (citing *Austin v. Jackson*, 213 F.3d 298, 302 (6th Cir. 2000)). And Petitioner's sentences were well below the maximum punishment authorized for his offenses. (*See* Doc. No. 24-1 at 49–52 (reflecting Petitioner received two ten-year sentences for rape, a Class B felony, and two four-year sentences for incest, a Class C felony)); Tenn. Code Ann. § 40-35-112 (b)(2), (3) (reflecting that the maximum punishment authorized by statute for Class B and C felonies is thirty and fifteen years, respectively). For all of these reasons, Claim 3 will be denied.

    2. Claim 5.J—Trial Counsel's Cumulative Errors

    Petitioner asserts that trial counsel's cumulative errors amounted to constitutionally ineffective assistance. "[T]he law of [the Sixth Circuit] is that cumulative error claims are not cognizable on habeas [review] because the Supreme Court has not spoken on this issue." *Daniels*

*v. Jackson*, 2018 WL 4621942, at \*6 (6th Cir. July 17, 2018) (quoting *Williams v. Anderson*, 460 F.3d 789, 816 (6th Cir. 2006)). Claim 5.J therefore does not state a viable ground for relief.

**B. Adjudicated Claims**

Petitioner exhausted his insufficient evidence claim on direct appeal and three of his ineffective assistance claims on post-conviction appeal.

### 1. Claim 2—Insufficient Evidence

Petitioner asserts that there was insufficient evidence to support his convictions. The TCCA identified the federal standard governing this claim as set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979), before rejecting the claim on the merits. *See Colwell*, 2016 WL 5416337, at \*3–4.

"Under *Jackson*, habeas corpus relief is appropriate based on insufficient evidence only where the court finds, after viewing the evidence in the light most favorable to the prosecution, that no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008) (quoting *Parker v. Renico*, 506 F.3d 444, 448 (6th Cir. 2007)). On federal habeas review, this standard "commands deference at two levels": "First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the [state court's] consideration of the trier-of-fact's verdict, as dictated by AEDPA." *Id.* (citing *Parker*, 506 F.3d at 448).

The TCCA ruled:

> "Rape" is the unlawful sexual penetration of a victim by the defendant accomplished by force or coercion, without the consent of the victim and the defendant knows or has reason to know at the time of the penetration that the victim did not consent, or where the defendant knows or has reason to know that the victim is mentally incapacitated or physically helpless. T.C.A. § 39-13-503(a)(2)–(3). "Sexual penetration" means sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body into the genital or anal openings of the victim's, the defendant's or any other person's body, but emission of semen is not required. T.C.A. § 39-13-501(7). "Incest" is sexual penetration of one's child. T.C.A. § 39-15-302(a)(1).

10

Viewing the evidence in a light most favorable to the State, we conclude that the evidence was sufficient to support the convictions for two counts of rape and two counts of incest. D.C. and J.C. testified that they were the biological children of Defendant. Both of the victims told Ms. Ladd, their grandmother, and the police that Defendant raped them. They described in graphic detail exactly how Defendant committed the offenses. D.C. explained that Defendant called her into his bedroom, removed her clothing, placed a pillow underneath her bottom, and penetrated her vagina with his penis. D.C. testified that she protested the entire time, was in pain, and was afraid. Defendant ejaculated on her stomach and ordered her to shower. She knew that Defendant had a vasectomy, so it was not surprising that there was no sperm present. D.C. testified that Defendant choked her at least once when he was raping her and told her no one would believe her if she went to the police. Similarly, J.C. testified that Defendant raped him the last time two days prior to the police report. Defendant ordered J.C. to kneel and perform fellatio while Defendant lay on the couch and put his hands on the back of J.C.'s head. J.C. was upset and angry during the encounter, and he ran to his room afterward because he felt like he was going to throw up.

Defendant claims that the State did not prove that J.C. failed to consent. J.C. testified that during the ordeal, he was thinking that he "did not want to do it" but had never told Defendant that before because he was "scared." J.C. also testified that he never told his father that he did not want to do it because he "didn't want to hurt his feelings." In our view, the jury was entitled to infer from the testimony that J.C. did not consent to executing fellatio on his own father. "[T]he inferences to be drawn from [the] evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006).

Moreover, the jury heard and discredited Defendant's theory that the children made up the allegations to avoid getting in trouble for having friends over to the house while Defendant was at work. D.C. acknowledged that she had friends over without her father's permission and that items at the house were damaged, but she testified that this had absolutely nothing to do with the report of the abuse. J.C. agreed, testifying that he would never lie about rape to avoid a "whipping." The jury assessed the credibility of the witnesses, clearly accrediting the testimony of D.C. and J.C.

Lastly, the State was not required to prove by physical evidence alone that the rapes occurred. We note that our supreme court has stated that "it has long been the rule in our state that the uncorroborated testimony of a minor victim may be sufficient to sustain a conviction for forcible or coercive sex offenses such as simple rape." *State v. Collier*, 411 S.W.3d 886, 899 (Tenn. 2013); *see also State v. McKnight*, 900 S.W.2d 36, 48 (Tenn. Crim. App. 1994) (holding that corroboration of minor victims' testimony not necessary to support a conviction for rape), *abrogated on other grounds by State v. Williams*, 977 S.W.2d 101 (Tenn. 1998); *Montgomery v.*

*State*, 556 S.W.2d 559, 560 (Tenn. Crim. App. 1977) (stating that rape statute does not require that testimony of minor female victim be corroborated to support a conviction of rape). Moreover, the testimony of the victims was accredited by the jury, and this Court will not re-weigh or re-evaluate the evidence on appeal. *Reid*, 91 S.W.3d at 277 (quoting [*State v.*] *Bland*, 958 S.W.2d [651,] 659 [Tenn. 1997]). It is not the role of this Court to reweigh or reevaluate the evidence, nor to substitute our own inferences for those drawn from the evidence by the trier of fact. *Id.* The evidence was sufficient to support the convictions. Defendant is not entitled to relief on this issue.

*Colwell*, 2016 WL 5416337, at *3–4.

This ruling was reasonable. Petitioner does not contest that the victims were his children, and a rational juror could have found beyond a reasonable doubt that the victims' "graphic" and "detail[ed]" testimony established the other required elements: sexual penetration, force or coercion, and lack of consent. *See id.* at *3. Arguing otherwise, Petitioner contends that D.C. and J.C.'s testimony was not credible and unsupported by physical evidence. (Doc. No. 1 at 10). But physical evidence is not required to sustain a conviction—"'testimonial evidence' . . . is sufficient as long as the jury is convinced beyond a reasonable doubt." *Gipson v. Sheldon*, 659 F. App'x 871, 881 (6th Cir. 2016) (quoting *Holland v. United States*, 348 U.S. 121, 140 (1954)). And as the TCCA noted, "the jury heard and discredited [Petitioner]'s theory that the children made up the allegations to avoid getting in trouble for having friends over to the house while [Petitioner] was at work." *Colwell*, 2016 WL 5416337, at *4. Indeed, the jury considered testimony directly supporting this theory from the victims' cousin. (*See* Doc. No. 24-4 at 114–15 (testifying that, the April before the June offenses alleged in the indictment, D.C. said she would lie and say that Petitioner raped D.C. if Petitioner caught D.C. having friends at home)). The jury nonetheless credited the victims' testimony that the charged offenses actually occurred. Such credibility determinations are "clearly the province of the jury." *Tyler v. Mitchell*, 416 F.3d 500, 505 (6th Cir. 2005) (citations omitted). This Court cannot "reweigh the evidence, re-evaluate the credibility of

witnesses, or substitute [its] judgment for that of the jury." *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009) (citing *United States v. Hilliard*, 11 F.3d 618, 620 (6th Cir. 1993)).

Petitioner also argues that there was insufficient evidence to support his convictions as to J.C. because the State failed to prove lack of consent beyond a reasonable doubt. (Doc. No. 1 at 10). Petitioner bases this argument on J.C.'s testimony that, despite not wanting to engage in sexual acts with Petitioner, J.C. never told Petitioner because J.C. did not "want to hurt [Petitioner's] feelings." (Doc. No. 24-4 at 29–30). However, J.C. also testified that: he did not tell Petitioner that he "did not want to do it" because he was scared (*id.* at 24); he was "angry" at Petitioner "for making [him] do it" (*id.* at 27); during the act, he was crying "some" (*id.* at 28); and after the act, he "ran up to [his] room" and "felt like [he] wanted to throw up." (*Id.* at 30). Juries have "broad discretion" to determine "what inferences to draw from the evidence presented at trial," and the Court must defer to a jury's determination as long as it "'dr[e]w reasonable inferences from basic facts to ultimate facts.'" *Coleman v. Johnson*, 566 U.S. 650, 655 (2012) (quoting *Jackson*, 443 U.S. at 319). The TCCA found that J.C.'s testimony allowed the jury to infer "that J.C. did not consent to executing fellatio on his own father." *Colwell*, 2016 WL 5416337, at *4. That conclusion was clearly reasonable. For all of these reasons, Claim 2 will be denied.

2. Ineffective Assistance of Trial Counsel

Petitioner asserts that trial counsel was ineffective in several ways. The TCCA applied the federal standard governing these claims—*Strickland v. Washington*, 466 U.S. 668 (1984)—to reject three ineffective-assistance claims on the merits. *Colwell*, 2020 WL 3886031, at *8–12.

Under *Strickland*, a petitioner must show (1) deficient performance and (2) prejudice to the defendant. *Knowles v. Mirzayance*, 556 U.S. 111, 124 (2009) (citing *Strickland*, 466 U.S. at 687). Counsel's performance is deficient where it falls "below an objective standard of reasonableness."

13

*Strickland*, 466 U.S. at 687–88. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). Prejudice requires a showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Further, when a petitioner raises an exhausted claim of ineffective assistance in a federal habeas petition, "[t]he pivotal question" is not "whether defense counsel's performance fell below *Strickland*'s standard," but "whether the state court's application of the *Strickland* standard was unreasonable." *Harrington*, 562 U.S. at 101. This amounts to a "'doubly deferential' standard of review that gives both the state court and the defense attorney the benefit of the doubt." *Burt v. Titlow*, 571 U.S. 12, 15 (2013) (quoting *Pinholster*, 563 U.S. at 190).

A. <u>Claim 5.B—Electronics Seized from Petitioner's Residence</u>

Petitioner asserts that counsel failed to request electronic devices seized from his residence and retain an expert to properly investigate them. As background, Detective Shrake testified that D.C. told Shrake Petitioner took pictures of D.C. with his cell phone, but Petitioner had deleted them at the time of the incident alleged in the indictment. (Doc. No. 24-3 at 73). Testimony also established that Petitioner had a webcam in the living room of his residence to monitor what was happening while he was away. (*Id.* at 60, 95, 98, 146–47, 179; Doc. No. 24-4 at 47). The day after the children reported the abuse, police executed a search warrant of Petitioner's residence and seized, among other things, computer equipment and hard drives, a cell phone, and the webcam. (Doc. No. 24-3 at 100–01, 116). Petitioner contends that counsel should have requested video

14

footage from the webcam to establish that the children were lying due to being caught with friends at the house, and that counsel should have retained an expert to test the electronics and establish that D.C. was lying about Petitioner having taken and deleted pictures. (Doc. No. 1 at 28–29).

The TCCA rejected this claim as follows:

> As noted by the post-conviction court, the parties never disputed that D.C. was caught with boys in the home on the day the victims made the allegations against the Petitioner. Moreover, the Petitioner failed to present any surveillance video at the evidentiary hearing. Therefore, he has failed to demonstrate deficient performance or prejudice for trial counsel's not showing the video to the jury. Similarly, the Petitioner failed to show that his electronic devices contained exculpatory evidence, and he did not present an electronics expert at the evidentiary hearing. This court may not speculate as to the content of a witness's testimony. *See Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). In addition, as noted by the State, trial counsel testified that while he believed the Petitioner's claim that the Petitioner did not sexually abuse the victims, he did not want to risk hiring an expert to find deleted photographs of D.C. Trial counsel's strategy was reasonable, and we will not second-guess his decision. Therefore, the Petitioner is not entitled to relief on this issue.

*Colwell*, 2020 WL 3886031, at *12.

The TCCA's deficiency and prejudice rulings were reasonable. As to deficiency, counsel testified at the evidentiary hearing that he filed a motion requesting exculpatory evidence under *Brady v. Maryland*, 373 U.S. 83 (1963). (Doc. No. 24-17 at 28). He also testified that he chose not to hire an expert because "the State had already searched the computers and equipment and didn't find anything," so he "certainly didn't want to hire [his] own expert to find" incriminating evidence. (*Id.* at 34, 46, 48–49). And it is not as though counsel ignored the lack of evidence from the electronic devices: on cross-examination of Detective Shrake, counsel elicited testimony that the FBI's search of the seized devices did not yield any inappropriate pictures of D.C. or evidence of child pornography. (Doc. No. 24-3 at 114–17). It was therefore reasonable for the TCCA to conclude that Petitioner failed to demonstrate deficiency in this regard.

15

Additionally, because Petitioner did not establish the existence of the surveillance footage he contends counsel should have obtained, and because he did not present an electronics expert at the evidentiary hearing, it was reasonable for the TCCA to find that Petitioner failed to demonstrate prejudice. *See Hutchison v. Bell*, 303 F.3d 720, 748–49 (6th Cir. 2002) (citations omitted) ("[A] petitioner cannot show deficient performance or prejudice resulting from a failure to investigate if the petitioner does not make some showing of what evidence counsel should have pursued and how such evidence would have been material."); *Tinsley v. Million*, 399 F.3d 796, 810 (6th Cir. 2005) ("In the absence of any evidence showing that [petitioner's proffered mitigating witnesses] would have offered specific favorable testimony, [petitioner] cannot show prejudice from counsel's strategy recommendation not to introduce this evidence."). Claim 5.B will be denied.

### B. Claim 5.C—D.C.'s Prior Sexual Activity

Petitioner asserts that he was prejudiced by counsel's failure to file a pretrial motion under Tennessee Rule of Evidence 412, which prevented him from raising the issue of D.C.'s prior sexual activity at trial. The TCCA rejected this claim:

> At trial, trial counsel asked D.C. if she had been sexually active "with at least one other person." The State objected, and the trial court found that trial counsel could not pursue the issue because he did not file a motion pursuant to Rule 412, Tennessee Rules of Evidence. The post-conviction court found that the Petitioner was not entitled to relief because he failed to present any proof at the post-conviction hearing of what D.C. would have said about her prior sexual behavior at trial.
>
> Tennessee Rule of Evidence 412 addresses whether evidence of a victim's prior sexual behavior is admissible and the procedure to determine when such information should be allowed into evidence. Usually, evidence of specific instances of a victim's sexual behavior is inadmissible. Relevant to this case, though, a defendant may introduce evidence of a victim's sexual behavior with persons other than the accused "to prove or explain . . . knowledge of sexual matters[.]" Tenn. R. Evid. 412(c)(4)(ii). However, the victim's knowledge of sexual matters must be relevant to an issue in the case. *State v. Douglass Leon Lyle*, No. E2012-00468-CCA-R3-CD, 2013 WL 1281857, at *14 (Tenn. Crim. App. [] Mar. 28, 2013) (citing Tenn. R. Evid. 402). As this court has noted, [" t]his provision["]

> will most frequently be used in cases where the victim is a young
> child who testifies in detail about sexual activity. To disprove any
> suggestion that the child acquired the detailed information about
> sexual matters from the encounter with the accused, the defense may
> want to prove that the child learned the terminology as the result of
> sexual activity with third parties.

*Id.* at *13-14 (quoting Tenn. R. Evid. 412, Advisory Comm'n Cmts).

> In order for evidence to be admissible under Rule 412, the accused generally must
> file no later than ten days prior to trial a written motion seeking to offer such
> evidence, and the "motion shall be accompanied by a written offer of proof,
> describing the specific evidence and the purpose for introducing it." Tenn. R. Evid.
> 412(d)(1)(i). The trial court must hold a jury-out hearing to determine whether the
> evidence described in the motion is admissible. Tenn. R. Evid. 412(d)(2). The trial
> court also must determine that the probative value of the evidence outweighs its
> unfair prejudice to the victim. *See* Tenn. R. Evid. 412(d)(4).

> In this case, D.C. was fifteen years old at the time of the abuse and sixteen at the
> time of trial, so she was not a young child. Trial counsel even acknowledged that it
> would not be unusual for a fifteen-year-old to have knowledge about sexual matters
> and that the jury's hearing D.C. was promiscuous could have prejudiced the jury
> against her. In any event, the only evidence about D.C.'s prior sexual behavior came
> from the Petitioner's testimony that he had "a feelin' " D.C. was sexually active,
> that he let D.C. know he was aware of her sexual behavior, and that she "did not
> deny [it]." Therefore, we conclude that trial counsel was not deficient for failing to
> file a Rule 412 motion and that the Petitioner has failed to demonstrate he was
> prejudiced by trial counsel's failure to file the motion.

*Colwell*, 2020 WL 3886031, at *11–12.

This ruling was reasonable. As the TCCA rightly noted, Petitioner did not put on any actual

proof of D.C.'s prior sexual activity at the evidentiary hearing. Counsel testified that his only basis

to believe D.C. was previously sexually active came from Petitioner, who told counsel that he "had

reason to believe that [D.C.] had had sex with one of the boys" who were "coming and going"

from Petitioner's residence. (Doc. No. 24-17 at 72; *see also id.* ("I didn't have any smoking gun

and physical proof that could have ever been put on that would have definitely proven, yes, she

absolutely had sex with this person.")). And Petitioner's testimony on this point was not definitive,

17

as Petitioner testified that he had a feeling D.C. was sexually active because Petitioner had "let it [be] known to [D.C.] that [he] was aware of her behaviors and she did not deny [it] at all." (*Id.* at 90). Because there was no evidence of how D.C. would have actually testified at trial regarding prior sexual activity, it was reasonable for the TCCA to conclude that Petitioner failed to demonstrate ineffectiveness for this claim. *See Hutchison*, 303 F.3d at 748–49; *Tinsley*, 399 F.3d at 810. Claim 5.C will be denied.

### C. Claim 5.F—Testimony of Rape on More than One Occasion

Petitioner asserts that counsel failed to object to testimony by Detective Shrake, D.C., and J.C., of rape by Petitioner on more than one occasion. Petitioner contends that counsel should have objected to this testimony under Tennessee Rules of Evidence 404(b). (Doc. No. 1 at 21–24, 31). The TCCA rejected this claim, finding that counsel made a reasonable strategic decision to (1) enter an agreement with the State before trial to limit questioning on this point, and (2) not object to the ensuing testimony:

> Tennessee Rule of Evidence 404(b) provides, "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes." The conditions which must be satisfied before allowing such evidence are:
>
> > (1) The court upon request must hold a hearing outside the jury's presence;
> >
> > (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
> >
> > (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
> >
> > (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

18

Tenn. R. Evid. 404(b); *see also State v. Thacker*, 164 S.W.3d 208, 240 (Tenn. 2005); *State v. Parton*, 694 S.W.2d 299, 302 (Tenn. 1985). Generally, "[o]nly in an exceptional case will another crime, wrong, or bad act be relevant to an issue other than the accused's character. Such exceptional cases include identity, intent, motive, opportunity, or rebuttal of mistake or accident." *State v. Luellen*, 867 S.W.2d 736, 740 (Tenn. Crim. App. 1992).

As noted by the Petitioner, the State indicted him for only one count of rape and one count of incest as to D.C. and only one count of rape and one count of incest as to J.C. Furthermore, the indictment alleged that all of the offenses occurred on June 13, 2014. On the morning of trial, the following colloquy occurred:

> [The prosecutor]: Judge, we – [trial counsel] and I have discussed the 404 issue. I think we've got an agreement on that we want to put on the record at any time.
>
> THE COURT: That's great. We can go ahead and do that now, if you want.
>
> Again, this morning [trial counsel] had filed a 404(b) Motion in Limine. The motion specifically speaks to another indictment that the defendant presently has pending against him. [The prosecutor] agreed that that would be precluded under 404(b) and that he would not attempt to elicit any -- or argue the prior pending indictment.
>
> [The prosecutor] also indicated to me that he anticipated asking the alleged victims in this case, Was this the first time that your father had done this? Or words to that effect. That was not covered under 404(b), the Motion in Limine specifically. I advised [trial counsel] that if there was going to be a 404(b) objection to that I was aware that I had to have a hearing outside of the presence of the jury, at which time I had to go through all of the steps, including finding by clear and convincing proof that those prior acts had occurred.
>
> [Trial counsel] was, at that point, not exactly sure if he wanted to voice an objection to that particular testimony or how deep it would get. [The prosecutor] indicated that he would not get any deeper with the testimony other than the simple question of, Is this the first time?
>
> So I understand now there is an agreement on that particular line of questioning; am I correct?
>
> [Trial counsel]: I think there is, Judge.
>
> THE COURT: Okay.

[The prosecutor]: And I think that agreement is what we discussed earlier. I intend to ask the victims whether this was the only or the first [time] or some words to that effect. I expect their answer to be, no, this was not the only time. But that's going to be the extent of discussions about prior instances. I'm going to be focusing on only the instances alleged in the indictment.

THE COURT: Okay. And, [trial counsel], your response?

[Trial counsel]: That's our agreement, Judge, that [the prosecutor] certainly can ask if it's the first time. And I may even, depending [on] the testimony on cross-examination, ask how long, but I'm certainly not going to get into any details. But as far as asking was it the first time and how long it had been happening, we have an agreement that those questions will be fine as long as no details are gone into about dates or specific acts or what was done at that point in time.

The State's first witness was Detective Shrake, who testified on direct examination that "[D.C.] had stated that her father had raped her the night before, and that it had – that was not the first time, that it happened before." During D.C.'s direct testimony, the prosecutor asked, "Did it only happen the one time?" D.C. answered that "[i]t happened a lot," and the prosecutor responded that he was only going to ask her about "the last time." The prosecutor asked D.C. to tell him what happened, and D.C. responded, "He would either lay on top of me or have me on my knees . . . . And sometimes he would lay flat on me and he would, you know – he would be rough with me." The prosecutor stated, "Okay. Now, again, you know, I'm just going to ask about the last time. That's the only thing that I want any specifics about. Is the position that you described for us, is that the way that you were on this last time?" D.C. answered yes, and the prosecutor asked if the Petitioner said anything to D.C. "during the act." D.C. answered, "Most of the time he didn't say anything, but if he did he would make noises or he would say, That booty's mine. He said that once or twice . . . . The last time I don't think he said that, but I know he was making noises." D.C. said that "[s]ometimes" the Petitioner would go into the bathroom with her to clean up. She said that she knew "something was happening" with J.C. as well and that she and J.C. talked about the abuse "a lot." D.C. stated that the Petitioner threatened her if she told anyone about the abuse and that "[h]e didn't threaten us with any weapons or anything. But like if he was raping me he would choke me or jam his finger in me or he would talk about how we would never get to see each other again."

During J.C.'s direct testimony, the prosecutor asked if "it happened before," and J.C. said yes. At the conclusion of J.C.'s testimony, the prosecutor asked, "And . . . the last incident that we've been talking about today, the one incident that we've been talking about here, did that occur here in Columbia?" J.C. again answered yes.

The post-conviction court found that the Petitioner was not entitled to relief, noting that trial counsel filed a pretrial motion to exclude evidence of other bad acts pursuant to Tennessee Rule of Evidence 404(b). The post-conviction court found that trial counsel's subsequently entering into the agreement with the prosecutor, so that the prosecutor could ask the witnesses if the sexual abuse alleged in the indictment was "the first time," was not deficient performance. We agree with the post-conviction court. At the evidentiary hearing, trial counsel testified that he could not remember why he did not object to the victims' testimony but acknowledged that his decision may have been strategic. The Petitioner did not ask trial counsel why he entered into the agreement with the prosecutor. At trial, though, trial counsel advised the trial court, "And I may even, depending [on] the testimony on cross-examination, ask how long [it had been happening], but I'm certainly not going to get into any details." We think trial counsel's statement confirms that his decision to enter into the agreement and not object to testimony about prior instances of abuse was strategic. We note that when trial counsel entered into the agreement, he fully anticipated that the Petitioner was going to testify to rebut the victims' claims. Our review of the trial transcript reveals that during trial counsel's opening statement, he repeatedly told the jury that the Petitioner was going to testify in order to explain why the victims were making up the allegations against him. However, after the State presented its proof, the Petitioner became nervous and decided not to testify. At the evidentiary hearing, trial counsel said that he thought the Petitioner's testifying to rebut the victims' claims probably was the Petitioner's "only chance" and that the Petitioner's decision not to testify was "very damaging." The Petitioner even acknowledged at the evidentiary hearing that he regretted not testifying and that he had nothing to lose by doing so.

"The fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). Moreover, "an accused is not deprived of the effective assistance of counsel because a different procedure or strategy might have produced a different result." *Vermilye v. State*, 754 S.W.2d 82, 85 (Tenn. Crim. App. 1987). This was a "he said, she said" case in which the defense's theory was that the victims were not credible. The State did not have any physical proof against the Petitioner, and the defense presented significant evidence that the victims had a motive to lie about the sexual abuse in order to keep the Petitioner from punishing them. Defense counsel's entire strategy was based on the Petitioner's proposed testimony, which would rebut the victims' testimony and show they were not credible. Therefore, we conclude that the Petitioner has failed to demonstrate trial counsel was deficient for entering into the agreement with the prosecutor and for not objecting to testimony about prior instances of abuse and that he has failed to demonstrate he was prejudiced by any deficiency.

*Colwell*, 2020 WL 3886031, at *9–11.

This deficiency ruling was not unreasonable. As the TCCA noted, counsel's strategy for handling the testimony at issue here—that Petitioner had raped the victims on more than one occasion—was based on the assumption that Petitioner would testify in his own defense. The record reflects that this assumption was well-founded. During opening argument, counsel told the jury that he anticipated Petitioner would testify to deny the children's allegations. (Doc. No. 24-3 at 39). At the evidentiary hearing, counsel testified that Petitioner's best chance for acquittal was to testify in order to rebut the children's anticipated testimony. (Doc. No. 24-17 at 25). Petitioner agreed that he spent a significant amount of time with counsel preparing to testify, and that it was not until the State rested its case-in-chief that Petitioner became very nervous and decided not to testify. (*Id.* at 109, 124). In short, counsel reasonably anticipated that Petitioner would testify to rebut the testimony in question, so he struck a deal to limit the State to a single context-framing question on this subject and chose not to object to the resulting testimony. Applying the doubly deferential standard of review for exhausted claims of ineffective assistance of counsel, it was not unreasonable for the TCCA to conclude that this strategy was within the wide range of reasonable professional assistance. *See Green v. MacLaren*, No. 17-1249, 2017 WL 3973956, at *2 (6th Cir. Aug. 2, 2017) (quoting *Miller v. Francis*, 269 F.3d 609, 615–16 (6th Cir. 2001); *Hughes v. United States*, 258 F.3d 453, 457 (6th Cir. 2001)) ("[A] 'strategic decision cannot be the basis for a claim of ineffective assistance unless counsel's decision is shown to be so ill-chosen that it permeates the entire trial with obvious unfairness.'").

The TCCA also reasonably concluded that Petitioner failed to carry his burden of demonstrating prejudice. *See Cobble v. Smith*, 154 F. App'x 447, 451 (6th Cir. 2005) (citing *Smith v. Robbins*, 528 U.S. 259, 285–86 (2000); *Williams v. Taylor*, 529 U.S. 362, 394 (2000)) (noting that a habeas petitioner "has the burden of demonstrating prejudice," and that the "burden is a

22

heavy one"). That is, even without Petitioner testifying, the jury considered Petitioner's theory that the challenged testimony was not credible. *See Colwell*, 2020 WL 3886031, at *11 ("[T]he defense presented significant evidence that the victims had a motive to lie about the sexual abuse in order to keep the Petitioner from punishing them."); (Doc. No. 24-4 at 114–15 (the victims' cousin's testimony supporting this point)). And Petitioner has not demonstrated a reasonable probability that the outcome of trial would have been different if counsel objected to the challenged testimony in the manner contemplated by Petitioner. For all of these reasons, Claim 5.F will be denied.

**C. Procedurally Defaulted Claims**

Petitioner's remaining claims—a *Brady* claim and seven ineffective-assistance claims—are procedurally defaulted without cause.

1. Claim 1—Withholding Exculpatory Evidence

Petitioner asserts that the State withheld exculpatory evidence, namely, video footage of the living room captured by the webcam seized by police. (Doc. No. 1 at 29). As background, J.C. testified that Petitioner raped him in the living room two days before he and D.C. initially disclosed the abuse. (Doc. No. 24-4 at 22). Petitioner contends that the webcam footage "would have prove[n] that the children were lying about their sexual abuse claims." (Doc. No. 1 at 29).

*Brady v. Maryland* "requires the prosecution to disclose all material exculpatory evidence to the defendant before trial." *Henness v. Bagley*, 644 F.3d 308, 324 (6th Cir. 2011) (citing *Brady*, 373 U.S. 83). "To succeed on a *Brady* claim, a petitioner must establish: (1) the existence of favorable evidence, either exculpatory or impeaching; (2) that the evidence was suppressed; and (3) that the suppression resulted in prejudice." *Hill v. Mitchell*, 842 F.3d 910, 926 (6th Cir. 2016) (citing *Strickland v. Greene*, 527 U.S. 263, 281–82 (1999)). "To show cognizable prejudice, [the petitioner] must establish that the suppressed evidence is material—that 'there is a reasonable

probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Id.* (quoting *Kyles v. Whitley*, 514 U.S. 419, 433 (1995)).

Respondent asserts that this claim is procedurally defaulted, and that Petitioner does not argue cause and prejudice to overcome the default. (Doc. No. 25 at 31 n.6). The Court agrees that this claim is defaulted, as Petitioner did not exhaust a *Brady* claim in state court, and no state court remedies remain. *See* Tenn. Code Ann. § 40-30-102(c) (establishing Tennessee's "one-petition" limitation on post-conviction relief); *Hodges v. Colson*, 727 F.3d 517, 530 (6th Cir. 2013) (citing *Fletcher v. Tennessee*, 951 S.W.2d 378, 380–81 (Tenn. 1997)) (explaining the three narrow circumstances in which a state prisoner may file a motion to reopen post-conviction proceedings, none of which apply to this claim). However, because the "cause and prejudice standard" of a procedural default analysis "tracks the last two elements of a *Brady* claim"—suppression and materiality—the Sixth Circuit has explained that it may be appropriate to address "the merits of [a *Brady*] claim with the understanding that [a] decision on the merits resolves any issues as to procedural default." *Akrawi v. Booker*, 572 F.3d 252, 261 (6th Cir. 2009) (quoting *Bell v. Bell*, 512 F.3d 223, 231 n.3 (6th Cir. 2008) (en banc)). The Court takes that approach here, but as explained below, Petitioner is not entitled to relief for two reasons.

First, Petitioner has not established that video footage of the living room for the relevant time period ever existed. The burden is on a habeas petitioner "to prove that the evidence was not disclosed to him." *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998) (citations omitted). Here, as the TCCA noted in ruling on another claim, Petitioner did not "present any surveillance video at the evidentiary hearing" in state court. *See Colwell*, 2020 WL 3886031, at *12. And he has not presented any evidence of the alleged footage's existence in this Court. Petitioner's *Brady* claim fails for this reason alone. *See Hendricks v. Lindamood*, No. 3:18-CV-00094-JRG-HBG, 2019 WL

24

5558571, at \*7 (E.D. Tenn. Oct. 28, 2019) (citing *Coe*, 161 F.3d at 344) ("[Petitioner] has failed to include any challenged evidence as part of his petition, and therefore, he has failed to sustain his burden of proving that evidence was not properly disclosed to him.").

Second, "a *Brady* violation does not occur when 'the defendant knew or should have known the essential facts permitting him to take advantage of the information in question, or if the information was available to him from another source.'" *Stojetz v. Ishee*, 892 F.3d 175, 206 (6th Cir. 2018) (quoting *Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000)). Here, in the Petition, Petitioner states that the webcam was "motion activated" and "took time stamped still photographs and automatically e-mailed them to [his] e-mail account." (Doc. No. 1 at 8). Petitioner gave consistent testimony on this point at the evidentiary hearing. (*See* Doc. No. 24-17 at 94–95). Petitioner likewise testified that, when the webcam was activated, it recorded videos "in increments of three minutes at a time" and sent the videos "to [Petitioner's] e-mail." (*Id.* at 95). Therefore, Petitioner knew or should have known that any exculpatory photographs or video footage from the webcam was available to Petitioner through his e-mail account. And because this alleged evidence, if it existed, was "readily available to the defense from another source, there simply [was] nothing for the government to 'disclose.'" *Matthews*, 486 F.3d at 891 (quoting *Coe*, 161 F.3d at 344). For all of these reasons, Claim 1 will be denied.

### 2. Ineffective Assistance of Counsel

There are seven ineffective-assistance claims remaining. These claims are procedurally defaulted because Petitioner did not to present them to the TCCA on post-conviction appeal, and he can no longer raise them in state court. *See* Tenn. Code Ann. § 40-30-102(c); *Hodges*, 727 F.3d at 530 (citing *Fletcher*, 951 S.W.2d at 380–81). As cause to overcome the default of certain ineffective-assistance claims, a petitioner may point to the ineffectiveness of post-conviction

25

counsel under the Supreme Court's holding in *Martinez v. Ryan*, 566 U.S. 1 (2012). But for the following reasons, Petitioner cannot rely on *Martinez* for that purpose here.

### A. Claims 4, 5.D, 5.E, 5.G, 5.H, 5.I—Defaulted on Appeal

Petitioner defaulted six remaining claims on post-conviction appeal. However, the ineffective assistance of post-conviction counsel cannot act as cause to excuse the default of a claim that is rejected by the post-conviction court, but not raised on appeal. *See Martinez*, 566 U.S. at 16 ("The holding in this case does not concern attorney errors in other kinds of proceedings, including appeals from initial-review collateral proceedings . . . .") (citations omitted); *see also West v. Carpenter*, 790 F.3d 693, 699 (6th Cir. 2015) ("[A]ttorney error at state post-conviction appellate proceedings cannot excuse procedural default.").

In Claim 4, Petitioner asserts that pretrial counsel was ineffective for failing to ensure that D.C. and J.C. were sequestered during each other's testimony at the preliminary hearing. And in Claims 5.D, 5.E, 5.G, 5.H, and 5.I, respectively, Petitioner asserts that trial counsel was ineffective for failing to: research CPIT protocol; consult a medical expert to challenge D.C.'s testimony based on a lack of supporting physical evidence; object to D.C.'s testimony that she was not worried about getting in trouble for having friends at the residence while Petitioner was at work; object to J.C. leaving the witness stand; and request that the State elect offenses at the end of trial. The post-conviction court rejected all of these claims in its written order. (Doc. No. 24-14 at 68 (Claim 4, addressed under "Preliminary hearing counsel"); *id.* at 65 (Claim 5.D, addressed under "Defense counsel's failing to impeach State's witnesses"); *id.* at 67 (Claim 5.E, addressed under "Failure to hire expert"); *id.* at 65 (Claim 5.G, addressed under "Failure to object to trial testimony"); *id.* at 67 (Claim 5.H, addressed under "Testimony of victim, J.C."); *id.* at 64–65 (Claim 5.I, addressed under "Election")). And Petitioner did not present these claims to the TCCA

on post-conviction appeal. Accordingly, Petitioner cannot rely on *Martinez* to demonstrate the cause necessary to obtain further review of Claims 4, 5.D, 5.E, 5.G, 5.H, and 5.I.

### B. Claim 5.A—Insubstantial

Finally, in Claim 5.A, Petitioner asserts that trial counsel was ineffective for failing to request to sever the offenses for trial. To excuse the default of this claim based on the ineffectiveness of post-conviction counsel, the claim must be "substantial." *Abdur'Rahman v. Carpenter*, 805 F.3d 710, 713 (6th Cir. 2015) (quoting *Martinez*, 566 U.S. at 17). "A substantial claim is one that has some merit and is debatable among jurists of reason." *Id.* (citing *Martinez*, 566 U.S. at 14). "In the converse, a claim is insubstantial when 'it does not have any merit'" or "'is wholly without factual support.'" *Porter v. Genovese*, 676 F. App'x 428, 432 (6th Cir. 2017) (quoting *Martinez*, 566 U.S. at 15–16). This claim is without merit.

"Under Rule 14 of the Tennessee Rules of Criminal Procedure, a defendant is entitled to seek a severance of offenses unless the offenses are part of a 'common scheme or plan and the evidence of one would be admissible in the trial of others.'" *Busby v. State*, No. M2012-00709-CCA-R3-PC, 2013 WL 5873276, at *17 (Tenn. Crim. App. Oct. 30, 2013) (quoting Tenn. R. Crim. P. 14(b)(1)). Petitioner contends that trial counsel was ineffective for failing to file a motion to sever because the offenses against D.C. and J.C. were not part of a common scheme or plan. (*See* Doc. No. 1 at 18 ("Because the offense[s] were not 'signature' crime[s] or part of a larger, continuing plan or conspiracy, the offenses[s] alleged against defendant did not constitute a common scheme or plan.")).

At the evidentiary hearing, trial counsel testified that he did not think a motion to sever would have been successful, and that trying the offenses together actually "benefitted [Petitioner's] defense strategy" of portraying the children as liars motivated by anger because "it was odd to

27

have an allegation against a father of sexual abuse of both a male and female victim." (Doc. No. 24-17 at 53–54). Therefore, counsel's decision not to request a severance was strategic, and such a strategic decision is presumptively sound. *See Strickland*, 466 U.S. at 689; *State v. Pottebaum*, No. M2012-01573-CCA-R3-PC, 2013 WL 3198132, at *10 (Tenn. Crim. App. June 21, 2013) (rejecting ineffective-assistance claim for failure to seek severance of offenses, even though "the trial court probably would have granted" a severance, because it was a tactical strategy to support the defense theory that the victims were motivated to lie about the offenses). Petitioner also has not shown a reasonable probability that the result of the proceeding would have been different if the offenses against D.C. and J.C. were severed for trial. Accordingly, Claim 5.A is insubstantial.

## VI. CONCLUSION

For these reasons, Petitioner is not entitled to relief under Section 2254 and this action will be **DISMISSED**. Petitioner's pending Motion (Doc. No. 28) will be **DENIED** as moot because the claim addressed in the Motion is already raised in the Petition.

Because this is a "final order adverse to" Petitioner, the Court must grant or deny a certificate of appealability (COA). Habeas Rule 11(a). A COA requires "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). "If the petition [is] denied on procedural grounds, the petitioner must show, 'at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it

debatable whether the district court was correct in its procedural ruling.'" *Dufresne v. Palmer*, 876 F.3d 248, 253 (6th Cir. 2017) (quoting *Slack*, 529 U.S. at 484).

For the reasons stated throughout the Court's analysis, the Court concludes that Petitioner has not satisfied these standards and will deny a COA.

An appropriate Order shall enter.

_____
WILLIAM L. CAMPBELL, JR.
UNITED STATES DISTRICT JUDGE